**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **STEVEN BLAKENEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 4:19-cv-00079-SNLJ** |
| | ) | |
| **UNITED STATED OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM AND ORDER</u>

This matter is before the Court on plaintiff Steven Blakeney's motion under 28 U.S.C. § 2255 to vacate, set aside, or correct the sentence imposed in *USA v. Blakeney*, 4:15-cr-00354. (ECF 1). Also before the Court are two motions for leave to conduct discovery related to Blakeney's Section 2255 motion. (ECF 2, 4), and a motion to expand the record (ECF 40). For the reasons that follow, this Court will **DENY** all four motions.

## I. BACKGROUND

On January 28, 2016, Blakeney was convicted by a jury on one count of conspiracy against rights rights in violation of 18 U.S.C. § 241, one count of deprivation of rights under color of law in violation of 18 U.S.C. § 242, and one count of falsifying records in violation of 18 U.S.C. § 1519. Blakeney was sentenced to an aggregate term of 51 months in prison. By way of his Section 2255 motion, he now seeks to set aside his sentence because he was allegedly deprived of effective assistance of counsel by his attorney, Clinton Wright, and because the Government purportedly failed to disclose exculpatory evidence.

1

The conduct underlying Blakeney's conviction involved claims that he orchestrated the arrest of mayoral candidate Nakisha Ford during a 2013 mayoral election in the city of Pine Lawn, Missouri. Blakeney, a former Pine Lawn police sergeant, was purported to have placed an unflattering sign of Ford—depicting her mugshot from a previous arrest—in the front window of Pine Lawn Food Market against the wishes of owner Mazen "Mario" Samad and his brother Akram "Sam" Samad. On March 31, 2013, Ford visited Pine Lawn Food Market and, seeing the sign, had it removed. Upon learning of this, Blakeney undertook a number actions to ensure Ford's arrest—including, among other things, instructing the Samads to provide a false story of Ford's alleged theft and disturbance at Pine Lawn Food Market, as well as providing false information to a subordinate officer in what would later become known as Incident Report 13-1337. Shortly after these efforts to build a story against Ford, Blakeney, three other polices officers, the chief of police, and Anthony Gray—the Pine Lawn Prosecuting Attorney— proceeded to Ford's residence and arrested her. Ford was charged with stealing and disorderly conduct, but the charges were reduced to a single littering charge; she ultimately pled guilty and paid a $500 fine. The facts are more fully set out in the Eighth Circuit's review of the underlying trial proceedings in *United States v. Blakeney*, 876 F.3d 1126 (8th Cir. 2017) (affirming Blakeney's conviction).

## II. ANALYSIS

### A.  Ineffective Assistance of Counsel

#### i.    Applicable Standards

To prove ineffectiveness of counsel, a defendant must satisfy a two-prong test as set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, "a defendant must demonstrate both that his attorney's performance fell below an objective standard of reasonableness and that he was prejudiced as a result." *Meza-Lopez v. United States*, 929 F.3d 1041, 1044 (8th Cir. 2019) (citing *Strickland*, 466 U.S. 668 (1984)). "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). In part, this is because "[a]n ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial[.]" *Harrington v. Richter*, 562 U.S. 86, 105 (2011). Thus, the "*Strickland* standard must be applied with scrupulous care[.]" *Id.* at 105.

Establishing performance deficiency under *Strickland*'s first prong requires a showing "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment." *Dat v. United States*, 920 F.3d 1192, 1194 (8th Cir. 2019). The goal "is not to second-guess every decision, but rather to ask what a reasonable lawyer would have done under the circumstances." *Adejumo v. United States*, 908 F.3d 357, 362 (8th Cir. 2018). Thus, a court must "determine whether, in light all of the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Cole v. Roper*, 623 F.3d 1183, 1189 (8th Cir. 2010). This context-sensitive analysis requires the court to make "every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenge conduct, and to evaluate the conduct from counsel's perspective at the time." *Kemp v. Kelley*, 924 F.3d 489, 500 (8th Cir. 2019); *see also*

3

*Maryland v. Kulbicki,* 136 S.Ct. 2, 4 (2015) (per curiam) (noting the "natural tendency to speculate as to whether a different trial strategy might have been more successful" and stating "to combat this tendency, we have adopted the rule of contemporary assessment of counsel's conduct."). And, because "advocacy is an art and not a science," *Strickland*, 466 U.S.at 681, counsel is afforded "a heavy measure of deference" in their strategic choices. *Strong v. Roper*, 737 F.3d 506, 518 (8th Cir. 2013).

Prejudice is another matter. "Unlike the deficient performance prong, evaluation of prejudice is not limited to a contemporaneous assessment, i.e., viewing the facts as of the time of counsel's conduct without the use of hindsight." *Whitmore v. Lockhart*, 8 F.3d 614, 622 (8th Cir. 1993). *Strickland*'s prejudice prong focuses, instead, on whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Lafler v. Cooper*, 566 U.S. 156, 163 (2012). In satisfying this standard, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Ford v. United States*, 917 F.3d 1015, 1021 (8th Cir. 2019). Rather, a defendant's proof must be sufficiently robust so as to "undermine confidence in the outcome." *Id.*; *see also Cullen v. Pinholster*, 563 U.S. 170, 190 (2011) (explaining a defendant must show a "substantial" likelihood of a different result and not merely a "conceivable" one). That is to say, while outcome is an important benchmark, the "ultimate inquiry must concentrate on the fundamental fairness of the proceeding." *Weaver v. Massachusetts*, 137 S.Ct. 1899, 1911 (2017); *see also Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993) (noting that prejudice focuses on the deprivation of fairness and reliability, not merely outcome, and explaining "analysis

4

focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective."). Accordingly, demonstrating mere theoretical prejudice is insufficient—prejudice must, instead, be so serious, so concrete in its effect, as to undermine the conclusion that a trial's results were both fair and reliable. *See Nelson v. United States*, 909 F.3d 964, 970 (8th Cir. 2018) (prejudice resulting from counsel's errors must be "so serious as to deprive [the defendant] of a fair trial, a trial whose result is reliable"); *see also Strickland*, 466 U.S. at 693-694  ("It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding. [Rather], the appropriate test for prejudice finds its roots in the test for materiality[.]").

In applying *Strickland*, "a court may decide [the] claim by addressing either prong. There is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Ford v. United States*, 917 F.3d 1015, 1021 (8th Cir. 2019) (quoting *Strickland*, 466 U.S. at 697).

### ii.    Failure to Call "Critical" Witnesses

Blakeney first argues his counsel was ineffective by failing to call four "critical" witnesses: (1) Anthony Gray—the Pine Lawn Prosecuting Attorney; (2) April Brooks—a cashier at Pine Lawn Food Market; (3) Rickey Collins—Chief of the Pine Lawn Police Department; and (4) Lawrence Fleming—a Pine Lawn Police Department Commander.

5

Blakeney also urges the Court to grant leave to conduct depositions of Gray, Brooks, and Collins, to essentially develop his postulations that each was a critical witness with information showing he was not the perpetrator of Ford's arrest.

 Succeeding on such an argument is a tall order. *See Raulerson v. Warden*, 928 F.3d 987, 998 (11th Cir. 2019) ("which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess"); *Hernandez v. Chappell*, 923 F.3d 544, 557 (9th Cir. 2019) (counsel, who forgot to subpoena witness for use at trial, was negligent; but, that still did not rise to level of ineffective counsel where, at best, the witness would have offered testimony of minimal probative value); *Weaver v. Nicholson*, 892 F.3d 878, 885 (7th Cir. 2018) (applying a strong presumption that failing to call witness "was strategic" and within the "wide range of reasonable professional assistance"). To be sure, "[a] reasoned decision not to call a witness is a virtually unchallengeable decision of trial strategy, in part because there is considerable risk inherent in calling any witness because if the witness does not hold up well on cross-examination, the jurors might draw unfavorable inferences." *Rodela-Aguilar v. U.S.*, 596 F.3d 457, 464 (8th Cir. 2010). Moreover, complaints of uncalled witnesses often rely on self-serving speculation, which cannot ordinarily pass the hurdles of *Strickland*. *See Sullivan v. Deloach*, 459 F.3d 1097, 1111 (11th Cir. 2006); *Sayre v. Anderson*, 238 F.3d 631, 636 (5th Cir. 2001).

The Court finds Blakeney has failed to demonstrate that Wright's performance was sufficiently deficient under *Strickland*'s first prong. Generally speaking, one of the lines of demarcation between effective and ineffective counsel lies on the notion of

reasonable investigations. If an attorney has reasonably investigated a case and its potential defenses, then resultant strategic decisions flowing therefrom are "virtually unchallengeable." *Link v. Luebbers*, 469 F.3d 1197, 1204 (8th Cir. 2006). Here, Blakeney's own affidavit acknowledges that Wright was well aware of the four witnesses at issue and had a firm knowledge about the things they could testify on in supporting Blakeney's defense; in fact, according to Blakeney, Wright was aware of *all* of the various things Blakeney now points to in arguing the strategic value of each witness. (ECF 1-1, ¶¶ 30-34). Blakeney does not point to Wright's ignorance or inattentiveness, but instead resolves to second-guess the apparent strategic reasons Wright chose not to call these witnesses. That criticism does not suffice. *See Forrest v. Steele*, 764 F.3d 848, 855 (8th Cir. 2014); *Marcrum v. Luebbers*, 509 F.3d 489, 503 (8th Cir. 2007). To be sure, each witness poses strategic problems had they been called.

Blakeney says Gray "would have provided relevant and probative testimony as to whether [] Blakeney conspired to arrest Nakisha Ford … or whether, instead, her arrest was the product of [] Gray's own decision to charge." In support, Blakeney points to Gray's May 29, 2019, deposition, in which Gray acknowledged it was his "sole decision" to arrest Ford. (ECF 26-1, p. 17). But, that deposition wasn't available to Wright at the time he was making trial decisions. *See Marcrum v. Luebbers*, 509 F.3d 489, 502 (8th Cir. 2007) ("we must view the facts as they existed at the time of counsel's conduct"). And, in any event, Gray's testimony has been less-than-consistent. In 2017, for example, Gray said "I'm not going to say I issued a[n arrest] order [to Blakeney] … if they wanted to arrest [Ford] that day, I felt that it would be something that I would prosecute." (Case

No. 4:15-cr-00354, ECF 195-1, pp 7-8). In fact, the information actually before Wright at the time suggested Blakeney personally brought the case to Gray's attention and that Mayor Caldwell (the incumbent running against Ford) was urging Ford's prosecution. When the underlying criminal case was on appeal, the Eighth Circuit expressly noted Wright's awareness of a possible Blakeney-Caldwell conspiracy. *U.S. v. Blakeney*, 876 F.3d 1126, 1132 (8th Cir. 2017). Wright also would have been aware of the indictment's language that states *both* that "the Prosecutor for Pine Lawn went to [Ford]'s residence [to] place[] her under arrest," *and* that, prior to her arrest, it was "Blakeney [who] caused false allegations to be provided to the Prosecutor[.]" (Case No. 4:15-cr-00354, ECF 2, p. 3). Simply put, even if testimony could have been elicited from Gray that he made the ultimate decision to arrest Ford, that does not further answer whether Blakeney influenced Gray's decision—and calling Gray would have opened the door for cross-examination on the exact circumstances influencing that decision, which Wright may well have wanted to avoid.

Blakeney says Brooks could have testified "as to whether there was probable cause to arrest Nakisha Ford" for theft and disorderly conduct as well as whether Blakeney encouraged Mario Samad to call the police. The second argument is curious because it was Sam Samad, not Mario, who called the police—the jury, in fact, heard Sam's 911 call, as well as testimony from Sam that Blakeney forced him to call the police. (Tr. Vol. II, pp. 128-132).  As for the first argument, the information before Wright shows that Brooks also believed she was forced by an "officer [to] write a phony statement in the incident involving Ford" and that Ford, ultimately, was "loud and

8

somewhat obnoxious[,] but was not overbearing or threatening." (ECF 15-1, p. 5).

Brooks also discusses how someone matching Blakeney's description "instructed other

police officers to go and arrest Ford." (*Id*. at p. 2). Again, eliciting the testimony

emphasized by Blakeney could have been a pyrrhic victory at best, as there was ample

room for cross-examination to proportionally bolster the Government's case.

 Blakeney says Collins could have testified about how Blakeney disagreed with the

decision to arrest Ford and argued about it with Gray and Mayor Caldwell. Blakeney

cites to a letter Collins allegedly signed explaining as much. As it turns out, however,

Collins later said the letter was drafted by Blakeney and his counsel and Collins suggests

he signed it after merely "brows[ing]" it because Blakeney had helped him in a civil

lawsuit of his own. Collins said he was especially bothered by the letter "where it said he

witnessed Blakeney arguing with Caldwell about the arrest of Ford. [He] only assumed

that was what the argument was about. [But,] it was a common occurrence for Blakeney

and Caldwell to argue." (ECF 15-1, p. 11-12). In addition, Collins described Blakeney as

a "terrible officer" and stood by his assessment that "Blakeney was always violating

people's civil rights." Once again, there was substantial risk in calling Collins as a

witness.

 Blakeney says both Collins and Fleming could have testified about how the police

report introduced at trial was not an "official" report because the Pine Lawn Police

Department required a handwritten signature on every page. Instead, Blakeney's name

was merely stamped onto the police report. (Case No. 4:15-cr-00354, ECF 118-2).

Blakeney does not make clear why this matters, however, since the reporting officer—

Jesse Brock—had signed his name to the report and told the jury that "all the information that [he] put into the report was provided by [] Sergeant Blakeney." (Tr. Vol. II, p. 225). To be sure, the Eighth Circuit has already explained that Brock's testimony at trial was enough to hold Blakeney accountable for having endorsed false information contained in a subordinate's report. *See Blakeney*, 876 F.3d at 1133 (citing *United States v. Moyer*, 674 F.3d 192, 208 (3d Cir. 2012)). There is, indeed, nothing in the falsification of records statute that requires falsification to be at one's own hands, oral mandates moving another's pen is sufficient. *See* 18 U.S.C. § 1519; *see also Moyer*, 674 F.3d at 207 (chief of police violated Section 1519 by endorsing false information contained in his subordinate's report). Thus, this additional testimony would not have helped Blakeney.

At bottom, there are a number of reasons why Wright may not have wanted to call these four witnesses—if each came with certain strategic advantages, they also came with notable disadvantages. So, it cannot be said "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment." *Dat*, 920 F.3d at 1194. And that conclusion leads into *Strickland*'s second prong: Blakeney also fails to demonstrate prejudice. His theory of ineffective counsel does not rise beyond the level that failing to call these witnesses had a "conceivable"— rather than "substantial"—"effect on the outcome of the proceeding." *Ford*, 917 F.3d at 1021; *see also Cullen*, 563 U.S. at 190 (defendant must show a "substantial" likelihood of a different result). Even if these witnesses were called, it is not clear whether the balance of their testimony would have favored the Government or Blakeney—or resulted in a net neutral. The positive aspects of their testimony cannot be considered in a vacuum, as

10

Blakeney urges. In sum, Blakeney fails to show that the result of trial would have been substantially different. *See McCauley-Bey v. Delo*, 97 F.3d 1104, 1106 (8th Cir. 1996).

That leaves Blakeney's discovery-related motions and motion to expand the record. Based on the foregoing analysis, the Court will deny Blakeney's two discovery motions because this case can be decided on its face. Blakeney seeks, among other things, depositions of Gray, Brooks, and Collins but only on topics this Court has already explained are insufficient to move the needle on Blakeney's Section 2255 motion. *See, e.g., Hart v. U.S.*, 2010 WL 3000039 at *1 (E.D. Mo. Jul. 26, 2010) (holding movant's motion for leave to conduct discovery was "premature" where the court had not yet decided whether the "claim is inadequate on its face"); *Coleman v. U.S.,* 399 F.Supp.2d 1008, 10109 (E.D. Mo. 2005) (denying discovery motion where Section 2255 claim was "without merit based on the motions, records, and law applicable to the case" and movant "failed to demonstrate that the [discovery] request … would lead to any information which might permit them to make out successful § 2255 claims"). Further, Blakeney seeks to file certain requests to admit, but these again fail to sufficiently account for the reasons Blakeney was convicted. For example, he wants the Government to admit that no warrant was issued; be that as it may, that wasn't the basis of Blakeney's conviction— warrant or not, Blakeney is alleged to have orchestrated Ford's unlawful arrest through false records and conspiratorial efforts to influence key witnesses, and that is exactly what the jury believed Blakeney had done.

As for the motion to expand (filed more than a year after this case was initiated), Blakeney says newly-acquired, unredacted FBI communications dated in 2013 shows that

11

(a)  Wright was ineffective for having failed to call Brooks in that "the unredacted documents support Ms. Brooks statement in her FBI 302 that Mario Samad called 911 immediately after his encounter with Nakisha Ford" and "the unredacted documents confirm that two calls were made to 911"; and (b) the documents "demonstrate that Blakeney did not approve Nakisha Ford's arrest report and supports [his] defense that the decision to arrest Ford was made without his input." These arguments retread the same ground. First, it was Sam, not Mario, that called the police at the direction of Blakeney— that is the call that the jury heard, and the jury also heard Sam testify that Blakeney made him do it. (Tr. Vol. II, pp. 130-132). Thus, though Mario may have called, too, it is pure conjecture that he did so before Sam was directed to do so by Blakeney. Nothing in these new records indicates Brook's testimony would have suddenly been determinative and/or clearly in Blakeney' favor. Second, the documents do not actually negate Blakeney's role in the police report. As is explained in more detail below (in the *Brady* violation analysis), nothing about the newly-offered police report clearly indicates Blakeney did not encourage Ford's arrest—the theory being offered is that he directed the contents of the police report, even if his signature did not appear on it initially (many versions have floated about, some with and some without Blakeney's signature). Simply put, nothing contained in the 16 pages of new records would change the results of this case. Blakeney's motion to expand the record is, therefore, denied.

### iii.   Failure to Rebut Nakisha Ford's Testimony Regarding Prior Altercation with Police

During the trial, the Government introduced the poster of Ford into evidence. (Tr. Vol. II, pp. 23-24). The poster contained a depiction of Ford from a prior arrest involving her encounter with Pine Lawn Police in July 2012. (Tr. Vol. III, pp. 43, 78-79). Ford testified that she was arrested for disorderly conduct, interfering with an arrest, and assaulting an officer. (Tr. Vol. III, pp. 21-22, 28-29, 47-48). However, she also testified that she believed she was ultimately arrested merely for commenting on the police's rough treatment of a man named Eric; she explained "there was no conviction for [interfering with an arrest] … I believe it was dismissed." (Tr. Vol. III, p. 29). Blakeney argues "Ford was lying about whether she had received a conviction," and criticizes Wright for failing to "confront Ford with certified copies of [her] conviction." Blakeney also says Wright should have called the officer involving in the July 2012 incident, Jared Anderson, to rebut Ford's claim that she did not, in fact, interfere with an arrest.

The Government says these criticisms go nowhere because Federal Rule of Evidence 608(b) would have prohibited both Anderson's testimony and introduction of certified copies of Ford's conviction. Further, the Government says the "certified copies of conviction" are anything but: "instead, the exhibit indicates that a *charge* of assaulting a police officer was dismissed, a *charge* of interfering with an officer was amended to littering, and a *charge* of resisting arrest was amended to littering." (emphasis added).

Rule 608(b) states "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." FED. R. EVID. 608(b). The Eighth Circuit has noted this rule "applies only when the sole reason for proffering [the] evidence is to show that the witness has done

13

things, unrelated to the suit being tried, that make him more or less believable per se." *United States v. Rojas*, 826 F.3d 1126, 1131 (8th Cir. 2016). However, "the rule does not address the admissibility of extrinsic evidence used to impeach a witness through … contradiction." *Id*.

There is nothing about an arrest or interfering with an arrest, in itself, that would tend to bear on truthfulness, and any extrinsic evidence offered to prove that specific conduct would rightly be rejected under Rule 608(b). *See Barber v. City of Chicago*, 725 F.3d 702, 709 (7th Cir. 2013) (noting that an arrest does not "impeach the integrity or impair the credibility of a witness."). Therefore, Anderson's proposed rebuttal testimony would, indeed, have been barred under Rule 608(b). *See U.S. v .Ramirez*, 609 F.3d 495, 499-500 (2d Cir. 2010) (officer's rebuttal testimony barred by Rule 608(b) to the extent it was offered to prove past conduct); *U.S. v. Douglas*, 46 F.3d 1127 (4th Cir. 1995) (officer's rebuttal testimony offered to attack credibility, rather than to impeach, was barred by Rule 608(b)).

But, Blakeney seemingly proceeds, instead, down the path of impeaching a witness through contradiction—pointing to Ford's "lies" and the need to rebut her "false statements" about her "convictions." The Court finds no contradiction in Ford's testimony. What Ford testified to was that she was arrested for interfering with an arrest, but that she was never *convicted* of that offense because she "had an attorney" and she "believe[d] it was dismissed." (Tr. Vol. III, p. 29). The rap sheet emphasized in Blakeney's argument does not contradict that testimony. It does not show, contrary to Blakeney's assertions, that she was ever convicted of interfering with an arrest; rather, it

14

shows Ford was *charged* with interfering with an arrest, which was ultimately pled down to littering. In any event, she also never gave the testimony that Blakeney attributes to her. She said, simply, that she *believed* the charge for interfering with an arrest was "dismissed" through efforts of her attorney. Technically, that charge was amended rather than dismissed; but, to a layman, it may as well have been "dismissed" since the original charge was never reduced to a conviction against Ford. *See Ramirez*, 609 F.3d at 500 (impeachment exception to Rule 608(b) inapplicable where rebuttal evidence did not accurately contradict witness's testimony).

### iv. Failure to Challenge Alleged Constructive Amendment or Variance to Indictment

The indictment references that a warrant was issued for Ford's arrest, which was "caused" by Blakeney's conspiracy and false pretenses. (Case No. 4:15-cr-354, ECF 2). Blakeney argues there was a "constructive amendment" to the indictment, or at least a "fatal variance" between the indictment and the evidence at trial, because "no evidence was adduced that an arrest warrant was ever issued for the arrest of Nakisha Ford" and because "the jury was [never] instructed as to an arrest warrant." Blakeney says his counsel was ineffective by failing address this discrepancy.

The Eighth Circuit has explained the difference between a constructive amendment and a variance as follows:

> A constructive amendment occurs when the essential elements of the offense as charged in the indictment are altered in such a manner—often through the evidence presented at trial or the jury instructions—that the jury is allowed to convict the defendant of an offense different from or in addition to the offenses charged in the indictment. In reviewing an appeal based on a claim of constructive amendment, we consider whether the

15

admission of evidence or the jury instructions created a substantial likelihood that the defendant was convicted of an uncharged offense. A variance arises when the evidence presented proves facts that are materially different from those alleged in the indictment. The basic difference between a constructive amendment and a variance is this: a constructive amendment changes the charge, while the evidence remains the same; a variance changes the evidence, while the charge remains the same. A variance is harmless error if it does not prejudice a defendant's right to notice, while a constructive amendment is reversible error per se.

*United States v. Johnson*, 719 F.3d 660, 668 (8th Cir. 2013) (internal citations omitted).

Here, there was no constructive amendment to the indictment because the essential elements of the offenses against Blakeney did not change; the existence—or not—of an arrest warrant does not "change the charge" against Blakeney. *Id*. To be sure, in count I Blakeney was charged with violating 18 U.S.C. § 241, which makes it a crime "if two or more persons conspire to injure, oppress, threaten, or intimidate any person … in the free exercise or enjoyment of any right or privilege secure to him by the Constitution or laws of the United States[.]" As the Eighth Circuit explained it when the underlying case was on appeal, "the Government must prove an actual agreement between two or more persons to accomplish a prohibited object." *Blakeney*, 876 F.3d at 1131 (emphasis added). Here, the object of the conspiracy—as explained in the indictment—was not the issuance of a warrant, but to "effect[uate] the arrest of [Ford] based on false allegations and without probable cause[.]" The transcript makes clear that Ford was arrested and, in fact, authorities had filled out a form for "wanted people" prior to arresting her. (Tr. Vol. II, p 228-231). That's enough—A conspiracy was undertaken that culminated in the arrest of Ford, warrant notwithstanding. In sum, whether a warrant was issued for Ford's

16

arrest simply does not bear on the core elements of the Section 241 claim as described in the indictment.

As for count II, Blakeney was charged with violating 18 U.S.C. § 242, which prohibits anyone acting "under color of any law … [to] willfully subject[] any person … to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States[.]" Reduced to its elements, a Section 242 offense requires proof that defendant (1) acted willfully (2) while under color of law (3) to deprive an individual of their constitutional rights. *Blakeney*, 876 F.3d at 1132. The actions described in count II were Blakeney's "false allegations" against Ford in his capacity as an officer, which caused her "unreasonable seizure." It is true that count II mentions that Blakeney "caused a warrant to be issued for the arrest of [Ford]." But, the "actions" taken in satisfaction of the first element were predicated on Blakeney's supplying of false information to his junior officer—not the issuance of a warrant— which led to an "unreasonable seizure" in satisfaction of the third element. As the Eighth Circuit explained, "[i]n other words, Blakeney supplied the information that purportedly justified Ford's arrest." *Blakeney*, 876 F.3d at 1133.

Blakeney's variance argument has more traction, as one of the overt acts described in the indictment was "the issuance of a warrant" by the city prosecutor caused by Blakeney's false allegations. (Case No. 4:15-cr-354, ECF 2). But, even if the evidence offered at trial differed slightly from the indictment, it was not a "material" difference. *United Stated v. Iu*, 917 F.3d 1026, 1034 (8th Cir. 2019). To be sure, the issuance of a warrant—or lack thereof—was not part of the "substantive evidence" needed to prove

17

Blakeney's guilt. *Id.* at 1035. His guilt was predicated on providing false information that led to Ford's arrest. At most, the issuance of a warrant would have been a supplementary addition to the evidence otherwise showing how Blakeney's false information effectuated Ford's arrest. The Eighth Circuit found that "Gray"—the city prosecutor—"did not authorize the charges independent of Blakeney's actions." *Blakeney*, 876 F.3d at 1133. To be sure, Blakeney was the impetus for the law enforcement processes that followed, ending in Ford's unlawful arrest—he and his attorney were made well aware of this theory of culpability by the indictment's language. Any nuance that a warrant may have added to this case was simply inessential, at most.

### v.   Failure to Properly Respond to Court Interactions with Jurors

After retiring to deliberate, the jury asked to read the testimony of three witnesses—Sam, Mario, and Mohammad Samad. This Court initially communicated with the jury outside of the presence of the parties and their counsel after facing difficulty tracking everyone down, telling the jury that "there is no transcript of that testimony to read." (Tr. Vol. IV, p. 65). But, the Court later informed both attorneys of the jury's question and neither objected or proposed an additional response. Blakeney now suggests a transcript should have been prepared on these three witnesses because their testimony included "substantial impeachment." He does not describe what that impeachment might be; but, suffice it to say here, the Eighth Circuit has already held that "the testimony requested [by the jury] was favorable to the Government in that it established that Blakeney forced the Samad brothers to make false statements. Thus, reviewing it likely would not have swayed the jury in Blakeney's favor." *Blakeney*, 876 F.3d at 1136.

18

Blakeney, citing *U.S. v. Millard*, 235 F.3d 1119 (8th Cir. 2000), points out that the Eighth Circuit was applying a plain error standard and not the *Strickland* standard when discussing the lack of prejudice. To his credit, *Millard* does, indeed, explain that *Strickland* poses a "slightly lower" burden compared to plain error. *Id*. at 1121. But, even if the burden is lowered slightly, Blakeney does nothing to satisfy it beyond offering a perfunctory argument that he "was prejudiced because the jury was unable to read the transcripts." Prejudice has not been shown here.

The jury had also asked this Court what document Blakeney was accused of falsifying. The Court responded: "[y]ou are to be guided solely by the evidence submitted and the Court's instructions." (Tr. Vol IV, p. 65). In its review, the Eighth Circuit said "the jury instructions included a verbatim recitation of the indictment, which specified that Blakeney was charged with falsifying police report 13-1337." *Blakeney*, 876 F.3d at 1135. Blakeney now accuses the Eighth Circuit of "misread[ing] the record" in that "the jury instructions did not contain a verbatim recitation of the indictment and did not refer to police report 13-337." Blakeney says this Court should have "advised the jury that Blakeney was accused of falsifying report 13-1337."

It is Blakeney who misreads the record. In its instructions, this Court read the following to the jury:

COUNT III - FALSIFICATION OF RECORDS

The grand jury further charges that:

One: The allegations contained in paragraphs 1 through 6 of Count I of this indictment are restated and incorporated herein.

> Two: Between on or about March 31, 2013, and on or about May 31, 2013, in St. Louis County within the Eastern District of Missouri, <u>Steven Blakeney, the defendant herein, did knowingly falsify and make a false entry in and cause to be falsified and a false entry to be made in a record and document to wit: Pine Lawn Police Department Incident Report 13-1337 related to the arrest of Nakisha Ford</u>, with the intent to impede, obstruct and influence, and in contemplation of, the investigation and proper administration of a matter within the jurisdiction of the Federal Bureau of Investigation, which was and is a department and agency of the United States government.
>
> In violation of Title 18, United States Code, Section 1519 and 2.

(Tr. Vol. I, pp. 82-83 (emphasis added)). Thus, by referring the jury back to the instructions that had been read to them, this Court answered the jury's question and did not leave them "confused" as Blakeney now argues.

At bottom, having carefully considered each of Blakeney's criticisms, this Court holds Blakeney has not demonstrated the ineffectiveness of his counsel at trial. None of the things argued by Blakeney indicate "a breakdown [of] the adversary process" sufficient to "render the result [of trial] unreliable." *Strickland*, 466 U.S. at 687. Blakeney fails to "[s]urmount[] *Strickland*'s high bar." *Padilla*, 559 U.S. at 371.

## B. Brady Violations

Blakeney argues, next, that the Government withheld the original police report 13-337 in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Blakeney argues the "government's key piece of evidence" as to count III was report 13-337. He points out "the original [] police report [] did not contain his signature" and, therefore, it "was not approved by him." He also acknowledges, however, the version admitted at trial also "contain[ed] no signatures," but instead "only the typed named of P.O. Jesse Brock as the

reporting officer and Sgt. Steven Blakeney as the approving officer." Curiously, he then doubles back in suggesting "the original report contains the written signature of P.O. Brock and a stamped signature of Blakeney." Whatever point he's trying to make, it appears Blakeney is concerned that one of the many versions of the report did not contain his signature and that particular version was allegedly withheld by the Government.

A *Brady* violation has three components: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *United States v. Anwar*, 880 F.3d 958, 969 (8th Cir. 2018) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999)). To establish a *Brady* violation, "the defendant must show that the evidence was *favorable and material* and that the government suppressed the evidence." *Id*. (emphasis in original). "Evidence is material only if there is a reasonable probability that, had it been disclosed, the result of the proceeding would have been different." *Id*.

Blakeney's *Brady* challenge can be resolved on a lack of materiality. It simply does not matter when (or if) Blakeney signed report 13-1337. As already explained by the Eighth Circuit, his guilt derived from the fact that he "provided the false information contained in the report [and] directed [his subordinate] to prepare it." *Blakeney*, 876 F.3d at 1133. Moreover, Brock—the officer who prepared the report—testified that Blakeney *did*, in fact, approve the report and, as Blakeney himself notes, his stamp does appear on at least one version of the report. (Tr. Vol. II, p. 227). Again, a Section 1519 offense can be based upon the endorsement of a subordinate's report. *See* 18 U.S.C. § 1519; *see also*

21

*Moyer*, 674 F.3d at 207 (chief of police violated Section 1519 by endorsing false information contained in his subordinate's report). Therefore, a myopic focus on the existence or timing of Blakeney's signature misunderstands the theory of culpability relied on at trial, which was predicated, instead, on Blakeney's mandate that a subordinate author a false record on his behalf. Blakeney does not escape culpability by falsifying a record through his subordinate and then artificially distancing himself from that record by pointing to a lack of his own signature. There is more than one way to falsify a record, and the evidence at trial supported the conclusion that Blakeney was guilty of one of them. Even assuming the Government failed to disclose to Blakeney one of the many versions of the report that happened to not have his signature on it, that failure to disclose is simply immaterial to the liability theory advanced at trial.

## III. CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff Steven Blakeney's motion under 28 U.S.C. § 2255 to vacate, set aside, or correct the sentence imposed in *USA v. Blakeney*, 4:15-cr-00354 (ECF 1) is **DENIED**.

**IT IS FURTHER ORDERED** that Blakeney's two motions for leave to conduct discovery (ECF 2, 4) and motion to expand the record (ECF 40) are **DENIED**.

So ordered this 29th day of July 2020.

_____
STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE